Rosa Molina de Manzanares, peticionaria y apelante, *v.* Andrés Lugo, Alcaide de la Cárcel de Distrito de San Juan, opositor y apelado.

No. 3688.—*Visto:* Noviembre 16, 1928. *Resuelto:* Diciembre 12, 1928.

*M. Rodríguez Serra*, abogado de la peticionaria; *José E. Figueras*, abogado de *El Pueblo*, apelado.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

Rosa Molina de Manzanares presentó una petición de *Habeas Corpus* en la Corte de Distrito de San Juan. Alegó que se hallaba encarcelada a virtud de orden de arresto del

fiscal del distrito, por considerarla éste co-autora del delito calificado por él de asesinato perpetrado en la persona de Amador Manzanares, esposo de la peticionaria. Alegó, además, que el fiscal se negaba a admitirle fianza y pidió a la corte que investigara la causa de su prisión y ordenara finalmente su libertad sin o con fianza ''porque la imputación que se le hace no tiene causa razonable o probable que justifique su arresto y menos aún sin admitírsele fianza mientras se sustancia el proceso.''

La corte de distrito expidió el auto, investigó la causa de la prisión y decidió, sin prejuzgar en forma alguna el caso en su fondo, que debía desestimar como desestimó la petición.

No conforme la Sra. Molina apeló para ante este tribunal, señalando en su alegato la comisión de cinco errores.

El primero de dichos errores se refiere al cometido a juicio de la apelante por la corte al admitir como prueba una carta dirigida al fiscal por el doctor Martínez Alvarez.

Hemos examinado la llamada carta y ella consiste en el dictamen pericial de la autopsia practicada en el cadáver del Sr. Amador Manzanares. Dicho dictamen se dirige al fiscal que ordenó la práctica de la autopsia, está firmado por el Doctor A. Martínez Alvarez, apareciendo después de la firma lo que sigue:

''Jurado y suscrito ante mí, por el doctor A. Martínez Álvarez. (Firmado) M. Romaní, Fiscal.''

Como puede verse, el error no existe. La ley no exige que se comience jurando el documento. Tal como el juramento fué tomado en este caso, debe entenderse que se juró el contenido del dictamen. La alegación de la apelante de que no podría sujetarse al médico a un proceso por perjurio de resultar falso alguno de los hechos esenciales del dictamen, carece de fundamento. Aún aceptando que el juramento apareciera tomado o prestado en forma irregular, ello

no sería admitido como defensa en una causa por perjurio, según el precepto terminante del artículo 117 del Código Penal.

■ Los restantes errores pueden reducirse a uno, a saber: la prueba aportada por el fiscal no demuestra la existencia de un delito de asesinato en primer grado, ni que sea evidente o grande la presunción de culpabilidad de la apelante.

Toda la evidencia que el fiscal presentó en la vista del auto de *Habeas Corpus*, consistió en el dictamen indicado y en la declaración jurada de un testigo.

El dictamen es demasiado largo para ser transcrito. De él se deduce que practicada la autopsia del interfecto Manzanares encontráronse en su cuerpo varias contusiones en las regiones craneana, toráxica y abdominal. Concluye así:

"Resumen de las lesiones de mayor importancia halladas en el curso de esta autopsia que por su carácter, intensidad y efectos produjeron *la muerte:*

"(a) Hemorragia intracraneana por contusión en la región fronto parietal derecha.

"(b) Hemorragia pleurítica por laceración de ambos pulmones.

"(c) Hemorragia intra-abdominal producida por rotura del bazo y riñón izquierdo.

"(d) Shock por pérdida de sangre."

Es evidente, pues, que la muerte de Manzanares sobrevino a consecuencia de las contusiones que recibiera. ¿Cómo y por quién se infirieron dichas contusiones? A demostrarlo tiende el otro documento presentado por el fiscal, que, copiado a la letra, dice:

"Ante el Fiscal del Distrito, Marcelino Romaní, comparece Francisco Montañez, quien después de prestar el debido juramento de acuerdo con la ley, dice:

"Que se llama Francisco Montañez, de 19 años de edad, y es vecino de San Juan; que allá por la noche del 26 al 27 de octubre de 1928, el declarante era mensajero de la Farmacia Colón No. 1, sita en la calle Monserrate de Santurce de la ciudad de San Juan; que dicha farmacia era de la propiedad de Don Amador Manzanares,

quien estaba casado con Rosa Molina; que Rafael Figueroa era de-
pendiente de dicha botica desde hacía dos meses y medio; que esta
farmacia estaba situada en una casa de dos pisos y en el segundo
piso había un balcón que estaba a una altura de la calle como de
seis metros; que debajo del balcón hay una acera de concreto y en
la calle hay muchas piedras y cascajos, las piedras son de distintos
tamaños, desde dos libras para abajo.

"Que en la noche del 26 al 27 de octubre el declarante estaba
durmiendo en los bajos de la casa donde está la farmacia; que como
de doce a doce y media de la noche vió al Sr. Amador Manzanares
que bajó a la farmacia a tomar una pepsina regresando inmediata-
mente a los altos de la casa, donde dormía la esposa; que al llegar
a la habitación donde está su esposa Rosa Molina, el declarante oyó
que Don Amador Manzanares dijo: "So sinvergüenzas, eso es lo que
ustedes hacen," y seguido sintió una lucha, un fuerte motín; que
entonces el declarante salió a la calle para desde allí ver lo que pa-
saba arriba en los altos; que este motín continuó por mucho tiempo
y entonces el declarante vió que Rosa Molina traía cogido por los
pies a Don Amador Manzanares y Rafael Figueroa por la cabeza;
que Amador Manzanares estaba mongo, más de la parte de la
muerte que de la vida y en esa forma lo trajeron al balcón de la
casa donde está la farmacia y allí Rosa Molina con un martillo o
un marrón bastante regular le dió con él en la frente a Don Ama-
dor Manzanares y entonces entre ambos, después que Rosa Molina
le dió dicho martillazo o marronazo, entre ella y Rafael Figueroa
lo tiraron por el balcón a la acera y a la calle, donde chocó con
ésta y con las piedras de la calle recibiendo muchísimos golpes.

"Que entonces después que lo tiraron a la calle Rafael Figueroa
huyó tirándose del balcón al garage, del garage a otro balconcito que
hay en el primer piso y de este balconcito abajo a la calle; que del
balcón donde fué tirado Don Amador Manzanares, es el balcón del
segundo piso, que como ya he dicho queda como a unos seis metros
de altura; que Don Amador cayó a la calle casi muerto y de ahí lo
llevaron al Hospital Municipal de San Juan, donde murió momentos
después."

He ahí el caso. Ejercitando el derecho que a todo ciu-
dadano reconoce la ley, la Sra. Molina pidió que se investi-
gara la causa de su prisión. El fiscal, acusador público,
sostuvo que había decretado dicha prisión sin fianza porque
en las diligencias que estaba practicando con motivo de la

muerte violenta del Sr. Manzanares había encontrado prueba bastante para creer que dicha muerte constituía un asesinato en primer grado y que uno de sus autores lo era la Sra. Molina. No se trata, pues, de juzgar a la apelante. Se trata simplemente de resolver si el fiscal estuvo o no justificado al decretar su encarcelamiento sin fianza.

El artículo 2 de la vigente Carta Orgánica de Puerto Rico, dice:

"Toda persona podrá antes de ser convicta, prestar fianza con suficiente garantía, excepto por crímenes capitales cuando la prueba sea evidente o la presunción grande."

Ese precepto constitucional es el mismo que regía en Puerto Rico desde el 1902 a virtud de lo dispuesto en los artículos 372 y 373 del Código de Enjuiciamiento Criminal, así:

"Art. 372.—Ningún acusado a quien se impute la comisión de un crimen que apareje la pena de muerte, podrá prestar fianza, cuando sea evidente la prueba o grande la presunción de su culpabilidad. El hecho de presentarse una acusación no da más fuerza a la prueba ni a la presunción que de ésta pueda deducirse."

"Art. 373.—Si la imputación fuere por cualquier otro delito, el acusado puede prestar fianza antes de ser convicto."

La ley que rige en el estado de California es igual a la de Puerto Rico. En el caso de *Flores* v. *El Pueblo,* 30 D. P.R. 583, 585, esta corte después de transcribir el artículo 372 del Código de Enjuiciamiento Criminal, dijo:

"Ese artículo es igual al 1270 del Código Penal de California. En dicho estado está además incluido dicho precepto en la constitución. Artículo 1, sección 6. Lo mismo sucede en Puerto Rico: Ley Orgánica, artículo 2, párrafo 4."

Siendo esto así, parece lógico recurrir a la jurisprudencia de California para interpretar el alcance del precepto, como lo hicimos en el citado caso de *Flores* v. *El Pueblo, supra,* para fijar la regla que debía seguirse después de formulada la acusación en el proceso.

Dicha jurisprudencia es como sigue:

"Las expresiones 'la prueba sea evidente' o la 'presunción grande' han recibido distintas interpretaciones por las cortes de los varios estados, resolviendo algunas cortes que el acusado tiene derecho a que se le fije fianza a menos que la prueba contra él sea tal que satisfaga a un jurado de su culpabilidad fuera de duda razonable; mientras que otros han resuelto que debe negarse la fijación de fianza cuando la prueba es suficiente en derecho para sostener una convicción con pena de muerte. La última regla ha sido adoptada en este estado. De igual suerte, en un procedimiento de *habeas corpus,* la corte no debe anticipar las actuaciones del jurado poniendo en libertad a una persona acusada de un delito que apareja pena capital, con o sin prestación de fianza, fundándose en prueba que la corte no puede decir que es insuficiente para permitir que quede en pie un veredicto por un delito que apareje pena capital. Se ha resuelto que para sostener una resolución rehusando fijarle fianza a una persona acusada de un delito que apareja pena capital, no es necesario que la prueba sea tan convincente que justifique un veredicto contra el acusado, sino que es suficiente si lo relaciona con el delito e induce a la creencia de que el acusado pudo haberlo cometido." 3 Cal. Jur. p. 1029–30.

Analizada la prueba aportada por el fiscal en este caso a la luz de la ley vigente tal como ha sido interpretada por la Corte Suprema de California, es necesario concluir que actuó derechamente la corte de distrito al negar la solicitud de la apelante.

A los efectos de la formación de nuestro criterio debe partirse de la base de la certeza de la declaración del testigo Montañez. Puede que sea deficiente en algunos extremos, susceptible de crítica en otros, pero hay que reconocer que guarda relación con el dictamen facultativo y que contiene imputaciones directas contra la apelante que de ser creídas por un jurado, le permitirían llegar a un veredicto de culpable de asesinato en primer grado.

"Asesinato es dar muerte ilegal a un ser humano, con malicia y premeditación (malice aforethought)." Artículo 199 del Código Penal. "Dicha premeditación puede ser expresa o tácita. Es expresa cuando se manifiesta el propósito

deliberado de quitar la vida ilegalmente a un semejante. Es tácita, cuando no resulta notable provocación, o las circunstancias que concurran demuestran un corazón pervertido o maligno.'' Artículo 200 del propio código. ''Todo asesinato por medio de veneno, acecho, o tortura, *y toda clase de muerte alevosa, deliberada y premeditada* (or by any other kind of wilful, deliberate, and premeditated killing) o cometida al perpetrarse o intentarse algún incendio de morada, rapto, robo, asalto, o mutilación, *constituye asesinato en primer grado;* siendo de segundo grado todos los demás.'' (Itálicas nuestras). Artículo 201 del mismo cuerpo legal. ''Toda persona culpable de asesinato en primer grado incurrirá en pena de muerte . . .'' Artículo 202 del Código Penal.

A virtud de la declaración de Montañez sabemos que en la noche del 26 al 27 de octubre último Manzanares fué desde el piso alto de la casa en que vivía al bajo en que estaba su establecimiento de farmacia a tomar una medicina, que regresó al piso alto y dirigió ciertas palabras en plural a las que siguió ''una lucha, un fuerte motín.'' El testigo se trasladó a la calle y desde ella ''vió que Rosa Molina traía cogido por los pies a don Amador Manzanares y Rafael Figueroa por la cabeza; que Amador Manzanares estaba mongo, más de la parte de la muerte que de la vida y en esa forma lo trajeron al balcón . . .''

¿Qué hizo entonces la apelante? Según el testigo, tomó un martillo o marrón y ''le dió con él en la frente a Manzanares . . .''

¿Y qué más hizo? Montañez le atribuye que entre ella y Rafael Figueroa tiraron a Manzanares ''por el balcón a la acera y a la calle.''

El balcón era el del segundo piso de la casa y de la calle fué recogido Manzanares para morir poco después como describe el doctor Martínez Alvarez en su certificación de autopsia.

Surge, pues, de esa prueba que la apelante en unión de otra persona dió muerte ilegal a su esposo de una manera alevosa, premeditada y deliberada. Aunque el término *alevoso* del texto castellano es más fuerte que el *wilful* del inglés, existe aquí la alevosía, ya que cuando Rosa Molina dió el martillazo en la frente a Manzanares éste estaba mongo, más de la muerte que de la vida. ¿Y qué otra cosa que deliberación y premeditación en la perpetración de la muerte revelan el hecho de sacar al balcón a Manzanares en aquel estado, darle en el balcón un golpe de martillo y luego arrojarlo desde él a la calle?

La jurisprudencia ha muchas veces resuelto que no se necesita el transcurso de un largo tiempo para decidir que existen la premeditación y la deliberación. Lo que se necesita es que surja de la prueba la actuación consciente y firme y persistente del autor para ocasionar la muerte aunque todo ello ocurra en un momento. Y aquí esa actuación consciente y firme y persistente surge clara de la prueba.

Nos hemos visto obligados a expresar nuestro juicio para resolver el caso que se nos ha sometido, pero deseamos insistir en lo dicho por el juez de distrito al fundar la resolución apelada. Nuestro criterio de ahora en nada prejuzga el caso ni puede ser invocado en forma alguna en contra de la apelante. La declaración de Montañez puede ser confirmada o destruida o explicada en otro sentido en el acto del juicio. La verdad puede ser otra que la expresada por Montañez. Sólo a virtud de la prueba que se practique por ambas partes en el acto de la vista, es que podrá ser juzgada definitivamente la apelante.

*Debe confirmarse la resolución recurrida.*

El Juez Asociado Sr. Hutchison disintió.